# People ex rel. Atchison, Topeka & Santa Fe Railway Co. et al. v. State Board of Equalization.

*District Court of Pueblo County, August 5, 1901, No. 4,388.*

Chas. E. Gast, Henry A. Dubbs, John M. Waldron, T. H. Devine, Albert L. Patterson, Rogers, Cuthbert & Ellis, Dines & Whitted, D. C. Beaman, Teller & Dorsey, Henry M. Blackmer, Kane Shinifer, Wolcott & Vaille, C. W. Watterman, attorneys for petitioners, presented the following brief upon the oral argument:

The attempted creation of this state board of assessors by this conference committee report, and the alleged adoption thereof, was a substantial and material amendment, within section 22 of article 5 of the constitution. Re house bill 250, 26 Colo. 234.

The determination of the question whether an amendment is substantial is a judicial one. Re house bill 250, 26 Colo. 234.

Comment on this case is unnecessary, because the same, identical thing was attempted in that case as was attempted in the case at bar. So that the case, in re house bill 250, is decisive of those two propositions.

The provision of section 22 of article 5 of the constitution, requiring substantial amendments to be printed, is mandatory. Re house bill 250, *supra*.

*Final passage* and *final vote*, as used in section 22 of article 5, means the last act of the legislative body upon the bill and its amendments. Norman v. Kentucky board, 93 Ky. 537, 543, 545; railroad tax case, 8 Sawyer, 238, 292, 293; People v. De Wolf, 62 Ill. 253, 255; re house bill 250, 26 Colo. 234, 239.

The conference committee report, unadopted, did not and could not amend the bill. People v. Lowenthal, 93 Ill. 207; Cohn v. Kingsley, 28 L. R. A. (Idaho), 85.

That the journal may be resorted to, in this state,

to determine whether, in the passage of the act, the constitution was complied with, has been settled beyond controversy. Re Roberts, 5 Colo. 525; Hughes v. Pelton, 11 Colo. 489, 492; Massachusetts Co. v. Colorado Co., 20 Colo. 1; Nesbit v. People, 19 Colo. 441; Marean v. Stanley, 31 Colo. 43.

As to mandatory provisions, they must be complied with by the legislative body, and compliance with the constitution must appear upon the face of the journal. In re Roberts, 5 Colo. 535; Cohn v. Kingsley, 38 L. R. A. (Idaho), 74; Starne v. People, 35 Ill. 121, 135, 136; Opinion of the Justices, 35 N. H. 579.

The court takes judicial notice of the time when the legislature convened, to-wit, 12 o'clock, noon, on the first Wednesday of June, 1901. (Const., sec. 7, Art. V.)

"No session of the general assembly shall exceed ninety days." (Const., sec. 6, Art. V.)

The court takes judicial notice of the fact that the regular session of the 13th general assembly expired at 12 o'clock, midnight, April 1st, 1901. Parol proof is admissable "whenever a question arises, in a court of law, of the existence of a statute or of the time when a statute took effect, or of the precise terms of a statute." Gardiner v. Collector, 6 Wall., 499, 508, 511; United States v. Allen, 36 Fed. 174; Fowler v. Pierce, 2 Cal. 165; In re Duncan, 139 U. S. 449, 457.

Parol proof is admissible to show the exact time when an act took effect, whenever it is necessary to determine conflicting rights. Louisville v. Savings Bank, 104 U. S. 469; Maine v. Gilman, 11 Fed. 214; In re Richardson, 2 Story's Repts. 571, 581; People

v. Clark, 1 Cal. 406; United States v. Stoddard 89 Fed 699; Brainard v. Bushnell, 11 Conn. 17; People v. Petrae, 92 N. Y. 129; Burgess v. Salmon, 97 U. S. 381; De Bow v. People, 1 Denio (N. Y.) 10; Legg v. Mayer, 42 Md. 203, 221.

The time of the president's approval of an act is a question of fact. United States v. Stoddard, 89 Fed. Rep. 701.

The general rule is that a day, in legal contemplation, is without fractions; so that any part is, for legal purposes, a day, and must be included as such, or also excluded altogether. 2 Bl. Com. 141; Bank v. Bank, 11 Mass. 204; Seward v. Hayden, 150 Mass. 158; Florida v. Town, 25 Fla. 371; Phelan v. Douglass, 11 How. Pr. 193; Duffy v. Ogden, 64 Pa. St. 240; Savage v. State; 18 Fla. 970; Cornell v. Moulton, 3 Denio 12; Stebbins v. Anthony, 5 Colo. 348; Sheats v. Sheldon, 2 Wall. 177; Arnold v. United States, 9 Cranch 104; Small v. McChesney, 3 Cowan 19; Clute v. Clute. 3 Denio 263; Rush v. Benschoten, 1 How. Pr. 149; Jones v. Porter; 6 How. Pr. 286; Blydenburg v. Cothoal, 2 N. Y. 418; Revill v. Claxton, 12 Bush. 558; Bunce v. Vogel, 38 Mo. 100; Hendrickson's Appeal, 24 Pa. St. 363; Rockhill v. Hanna, 4 McLean 554; Kim v. Osgood, 19 Mo. 60; Lang v. Phillips, 26 Ala. 311; Columbia Turnpike v. Haywood, 10 Wend. 422; Re. Wellman, 20 Vt. 653, 655, 656.

In the computation of time prescribed by constitutional or statutory provisions for the performance of official acts, the general rule is that fractions of a day are not to be noticed, but each fraction is to be considered in the computation as a full day. Re Senate Bill No. 56, 2 Colo. 632; Smith v. Jefferson, 10 Colo. 17.

The only exception to the above rule is when it is necessary to determine priorities, as between private acts and transactions on the same day, and when the exact point of time must be determined at which an act was done. Brainard v. Bushnell, 11 Conn. 17, 23; Welch v. Boyle, 30 Md. 262, 267; Phelan v. Douglas, 11 How. Pr. 193; Louisville v. Savings Bank, 104 U. S. 439; Grosvenor v. McGill, 37 Ill., 239; Rowe v. Hersey, 3 Wils, (Eng.) 274; Combe v. Pitt, 3 Burrows, 1423, 1434; United States v. Stoddard, 39 Fed. 669; Cromelien v. Brink, 29 Pa. St., 522.

Within the ninety days allowed by the Constitution for a legislative session Sundays are included. Re Senate Bill 56. 9 Colorado, 632.

A day, in legal contemplation, is the space of time between two successive midnights, or any part thereof. Clayton's Case, 5 Coke, 1, vol. 3; 1 Ld. Raymond, 480; Lester v. Garland, 15 Ves. Jr., 248, 253; Sims v. Hampton, 1 S & R. (Pa.,) 411, 412; Pierpont v. Graham, 4 Wash. (C. C.) Rep., 232, 240; Stebbins v. Anthony, 5 Colo. 343, 360; Northrup v. Cooper, 23 Kans., 432; Ogden v. Redman, 3 A. K. Marshall, 234; Duffy v. Ogden, 64 Pa. St.. 240, 242; Homer v. Liswell, 6 Cowan, 660; Welch v. Boyle, 30 Md., 262, 267; Bank v. Bank, 11 Mass. 204; U. S. v. Norton, 97 U. S. 170.

In estimating time from an act done, the day on which the act was done must be included. Presbrey v. Williams, 15 Mass. 193; Com. v. Keriston, 5 Pick., 420; Hampton v. Bronseller, 2 Brown's Repts., 18; Ryman v. Clark, 4 Blackf. Rep., 329; Jacob v. Graham, 1 Blackf. 392; Northrup v. Cooper, 23 Kans. 432; Ogden v. Redman, 3 A. K. Marshall, 234; Pollard v. Yoder, 2 A. K. Marshall, 264.

When the law provides a *per diem* compensation, the officer is entitled to his daily compensation for each day of which any part was performed in official service. Smith v. Jefferson County, 10 Colo. 17.

Charles C. Post, attorney general, George M. Post and Cæsar A. Roberts, assistant attorneys general, Morrison & DeSoto, of counsel, for respondents, submitted the following brief:—

In determining the construction of a law resort may be had to the journals of the two houses.

After a conference report the house voted to recede from its amendment; *Held*, to be a passage of the bill. Robertson v. People, 20 Colo. 279.

Many states refuse to go beyond the enrolled bill as is the English usage. More American states allow the journals to be looked to.

1. The printed statute is *prima facie* evidence of its passage.

2. The journals may be inspected. By the journal is meant the roll of papers and memoranda.

3. The direction that the bill shall be signed in the presence of the house is directory only.

The bill was held good on an aye and no vote on adopting report of the conference committee, and to concur or non-concur in certain amendments and no vote on final passage of the bill as amended. In re. Roberts, 5 Colo. 534.

A question of fact as to actual passage of a bill is question of law to be decided by the court. Nesbit v. People, 19 Colo. 450.

Evidence outside the journals will not be considered. In re. Division of Howard County, 15 Kans. 213.

The rescission from amendments is a sufficient

final passage. Id.

The enrolled bill is conclusive unless the journals positively show non-conformity. In re. Nanderberg, 28 Kans. 243.

Journals should show bill read three times, but passage will not be impeached for its absence. The enrolled bill is *prima facie* evidence of its passage. Mass. Co. v. Loan and T. Co., 20 Colo. 1.

Same case construes Sec. 20, Art. V of the constitution, that bill need not be printed before it is read. Doubtful whether.a bill can be impeached by memoranda.

The printing of substantial amendments is mandatory—whether or not the amendment is substantial is a judicial question. In re. H. B., No. 250, 26 Colo. 234.

Journals are the only evidence to impeach the passage of a statute. Nor can the journals be contradicted by loose memoranda. Only where the constitution required "the journals to show the action taken" will the absence of recitals be proof of non-compliance with forms. *Ex parte* Howard, 24 So. 519.

The court will correct a clerical error in the journal. O'Hara v. State, 25 So. 623.

The roll of memoranda is not part of the journal. Montgomery Wks. v. Gaston, 28 So. 503.

No case can be found where the courts go beyond the journal to impeach a statute. Montgomery Wks. v. Gaston, 28 So. 504.

Where a yea and nay vote was taken on the original passage. Not required on receding from amendments. Entering the yeas and nays is only directory. People v. Supervisors, 8 N. Y. 328.

Where a conference committee report is adopted it need not be by yea and nay vote. It is enough if a yea and nay vote has been taken on the final passage in each house.

The vote on report of conference committee is not the vote on the final passage of the bill. State v. Corbett, 32 S. W. 687 (Ark.).

Adoption of report of conference committee vote taken by yeas and nays is a final passage of the bill. This is a matter for legislative construction. Browning v. Powers, 38 S. W. 944.

A concurrence in amendments is a sufficient passage. McCulloch v. State, 11 Ind. 434; Hull v. Miller, 4 Neb. 506.

All presumptions exist in favor of the passage where the journal is silent. Same presumptions as those which support judicial proceedings. McCulloch v. State, 11 Ind. 434.

Journals conclusive of date of passage of bill. White v. Hinton, 3 Wyo. 758.

The court will not go behind the official signatures to inquire whether a bill had been read three times. Carr v. Coke, 116 N. C. 223.

Note giving action of every state: 13 holding that the enrolled bill cannot be impeached; 21 holding that the journals control. The case itself holds that the court would not examine the journals to see whether the enrolled bill contained an interpolated section. Field v. Clark, 143 U. S. 661, 680.

Every intendment is in favor of the act and it will stand unless the journals show conclusively that it was not passed. Com. Council v. Assessors, 91 Mich. 81.

While these rules are obligatory the legislative

action is not subject to supervision and revision by the courts—the courts cannot explore legislative journals to see if the rules were lived up to. Hunt v. Wright, 11 So. 608 (Miss.).

The courts will not go beyond the bill—overruling previous cases where they considered the journals. State v. Town Council, 17 S. E. 755.

A protest cannot show there was no quorum. "It must be conceded that neither Senator Taylor alone nor all the other protesting senators together would, under the well-settled law of every state in the American union, be permitted to appear in court and give evidence to the same effect as this protest, against the truth of the journal entries of the 24th of February. If this be so, what effect will the law give to a naked protest or an *ex parte* affidavit, even though the same be spread upon the journals? The answer is obvious. The protest and affidavits can have no effect whatever, and can no more be considered as impeaching the verity of the journal than would parol or other proof outside of such journal." Auditor General v. Board of Supervisors, 51 N. W. 493.

*Practice.*—If demurrer is filed, it should be to the alternative writ which is the primary pleading, and must state a cause of action. Nance v. People, 25 Colo. 259; Gillett v. People, 13 A. 556.

State board is not a corporation, yet has in some respects the similitude of one. People v. Lothrop, 3 Colo. 453.

If an answer in mandamus sets up any sufficient reason for refusing the writ it should not be quashed as a whole. Legg v. Mayor, 16 Am. Law Reg. N. S. 25.

Courts will not declare a statute void even upon the admissions of the respondents in mandamus. Id.

Burden of proof is on the parties attacking the statute, with a strong presumption against them. Id.

*Passage After Midnight.*—One day. The word "day" may be used to indicate a measure, not a point of time. Hyde v. White, 24 Tex. 145.

A tax was paid on the morning of March 3d; same day in the afternoon act was approved increasing tax. *Held*, That the extra tax could not be collected. Burgess v. Salmon, 97 U. S. 383. Same ruling on repeal of bankrupt act. In re Ankrim, 3 McC. 285.

A legislative is not a calendar day. Immemorial custom to hold after 12 o'clock. White v. Hinton, 3 Wyo. 758.

Fifty days—Sundays are not included; fifty legislative week days. Exp. Cowert, 92 Ala. 97; Moog v. Randolph, 77 Ala. 608; 9 So. 225.

A law purported to be approved March 8 the last day of a sixty-day session. The court refused to go beyond the journals to show that it was not approved till the 10th. Territory v. Clayton, 18 Pac. (Utah), 626.

The ancient maxim that the law knows no fractions of a day, is now known chiefly by its exceptions. Maine v. Gilman, 11 Fed. 214.

An act divesting jurisdiction of certain officers in certain actions was approved May 7. To divest the officer of jurisdiction it must be shown that the suit before him was commenced May 7 at an hour later than the governor's signature. Kennedy v. Palmer, 6 Gray, 316.

Where justice requires it, the true time of the

passage of an act may be shown "even to the hour of the day." Lapeyre v. U. S., 17 Wall. 203.

Legislative day of March 2 held to have included March 2, 3 and part of 4, until noon. Court would inquire on which date bill actually passed. In re. Wynne, 9 Am. L. Reg. N. S. 629.

When necessary to determine conflicting rights, courts of justice will take cognizance of fractions of a day. Louisville v. Savings Bank, 104 Wall. 469.

It is not a mathematical point which cannot be divided. Id., p. 478.

The hour of signing an act may be inquired into and proof received. People v. Clark, 1 Cal. 409.

A day in legal consideration is *punctum temporis*, and the law knows no fractions of it, and yet when justice requires this maxim yields and the exact time when an act was performed may be shown—this was for priority between two attachments. Brainard v. Bushnell, 11 Conn. 24.

*Sections of Constitution Involved.* (References are to Mills Const. Ann.)

§ 303. All executive officers (except lieutenant governor) shall reside at the seat of government.

§ 329. No session of the general assembly shall exceed ninety days.

§ 330. General assembly shall meet at 12 o'clock noon.

§ 345. All substantial amendments shall be printed before the final vote is taken on the bill. Vote on final passage to be taken by ayes and noes.

§ 346. No report of any committee of conference shall be adopted except by a vote of a majority taken by ayes and noes.

§ 450. State board of equalization created to consist of certain officers.

Dixon, J.

This is a proceeding in *mandamus*, instituted by The Atchison, Topeka & Santa Fe Railway Company and other corporations, owning property subject to taxation in various counties of this state, against the State Board of Equalization, for the purpose of obtaining a judicial determination of the question as to the validity or invalidity of the revenue bill, which appears to have been enacted by the thirteenth general assembly.

The case involves no question of conflict between the substance of any of the provisions of the bill and the constitution; but presents an attack upon it as an entirety, on the ground that it was not enacted in accordance with the mandates of the constitution.

The specific objections urged against its validity are:

First: That the bill was passed after the legislative session had terminated by constitutional limitation, in violation of Colo. Const. Art 5 § 6.

Second: That the bill, as authenticated by the presiding officers of the two houses and signed by the Governor, was never in fact passed by the senate.

Third: That if the bill passed the general assembly, it carried with it substantial amendments which had not been printed, in violation of Colo. Const. Art. 5 § 22.

The various propositions raised by these objections have been discussed by counsel for both relators and respondents, from every point of view, with great learning and ability. But the view which I take of the case renders it necessary to determine

but few of the many questions that have been argued, the solution of which call for the application of only a few fundamental principles, and will not, I think, carry us upon any fairly debatable ground in constitutional law.

At this day, the courts of this country are unanimous in holding that the judiciary has the power to declare any statute unconstitutional and void, if the substance of its provisions be in conflict with the constitution. But no question has called forthmore profound reasoning, more intense expression, or greater conflict in judicial opinion than that of the power of courts to investigate the modeof the enactment of the statute, and to declare it void, if the investigation shows that, in its enactment; mandatory provisions of the constitution have been disregarded.

The conflicting decisions ugon this question may be fairly divided into three groups:

First: Those which hold that where a statute is found in the public archives properly authenticated and signed by the governor, the courts are concluded thereby, and it is not within their province to investigate from any sources the mode of its enactment.

Second: Those which hold that it is within the province of the courts, when their jurisdiction is properly invoked, to investigate the mode of enactment of a statute; that for this purpose they may resort to the journals of the two houses, and that unless it affirmatively appears upon the face of the journals that each and every mandatory provision of the constitution has been substantially complied with, it is their duty to declare the statute null and void.

Third: Those which hold that it is within the province of the courts, when their jurisdiction is prop-

erly invoked, to investigate the mode of enactment of a statute; that for this purpose they may resort to the journals of the two houses, but it is their duty to sustain the statute, unless it certainly and affirmatively appears upon the face of the journals that the mandatory provisions of the constitution have not been complied with. In this class of cases, it is held that while the journals ought to show that each mandatory provision has been complied with, it is necessary for those things only to appear which the constitution expressly commands to be spread upon them; as to all other matters, the journals being silent, the courts will presume that the constitutional provisions were complied with.

The supreme court of this state has unequivocally adopted the doctrine of the cases of the third group. So that it is the duty of this court, its jurisdiction being properly invoked, to investigate the mode of enactment of the bill in question, from the journals of the two houses; and if it finds that it certainly and affirmatively appears upon their face that mandatory provisions of the constitution have been disregarded in its enactment, to declare the statute null and void. In re Roberts, 5 Colo., 525; Insurance Co. v. Loan Co., 20 Colo. 1; Robertson v. The People, 20 Colo. 279.

It appears from the journal of the house of representatives that "A bill for an act in relation to public revenue, and repealing all previous acts in relation thereto," known in the legislative proceedings as "House Bill No. 1," was introduced in the house, read by title and referred to a committee on January 9th, 1901. It passed in an orderly way through the regular stages of parliamentary procedure, and final-

ly, on March 7th, was constitutionally passed, and transmitted to the senate.

From the senate journal it appears that on March 7th the bill was received, read by title and referred to the finance committee. On March 11th, it was referred to the committee of the whole for consideration. On March 23rd, the committee of the whole presented its report, recommending a large number of amendments to the bill, which are spread at length upon the journal. The report was adopted, and the amendments ordered to be printed. On March 25th, the bill as amended by the senate was read a third time and constitutionally passed. It was then transmitted to the house with the senate amendments, in which the house refused to concur, and demanded a conference.

The final report of the conference committee appears to have been presented on April 1st, and is spread at length upon the journals of both the senate and the house. The first paragraph of this report, which contains its recommendations, reads as follows:

"Your committee, to whom was referred House Bill No. 1, 'a bill for an act in relation to public revenues and repealing all previous acts in relation thereto,' have had the same under consideration, and beg leave to submit the following report, and recommend that the senate amendments to H. B. No. 1 be changed to read as follows, and as amended be adopted."

This paragraph is type-written and pasted upon a printed copy of the senate amendments, which copy is changed by interlineations, erasures, cancellations, by pasting printed slips and by the insertion of type-

written pages, so as to express the intention of the conference committee. In thirty-eight different places, ink lines are drawn through the printed matter, striking out one hundred lines; in three places interlineations are made with pen; in four places printed slips are pasted over the original, and four pages of type written matter are inserted. No description can give any accurate idea of the construction of this document. To appreciate it, it must be inspected. I can only say that it fully justified the protest as to its condition made by certain members of the house and spread upon the journals.

After the presentation of the report of the conference committee, the house journal under date of April 1st shows:

"Motion that the amended report of the committee on conference on House Bill No. 1 be adopted."

"The question being, "Shall the motion prevail?" The roll was called with the following result; then follows the names of fifty-one members voting aye, one voting nay, five recorded as absent, seven recorded as present but refusing to vote.

"A majority having voted in the affirmative, the report was declared adopted."

The journal then shows that the roll was called upon the passage of House Bill No. 1, the question being "Shall House Bill No. 1, as amended pass?" The roll was called, and a constitutional majority voted in the affirmative, and the bill was declared passed.

From the senate journal it appears that upon the presentation of the report of the conference committee:

"It was moved and seconded that the report of the

conference committee on House Bill No. 1 be adopt-
ed, and the roll was called with the following re-
sult;" then follows the names of twenty-three senators
voting aye, and the names of four senators voting
nay. "The motion was declared carried, and the re-
port of the conference committee adopted."

It does not appear from the senate journal that
any further action was ever taken by that body upon
the bill.

It is contended by the relators that the report of
the conference committee contained many substantial
amendments, which had never been considered by
either the house or by the senate, and which had not
been printed.

It would greatly facilitate the investigation, if I
were permitted to examine the engrossed bill passed
by the house on March 7th, 1901, as certified by the
secretary of state from the archives of his office. I
think that I could properly do so. In my judgment,
the act of 1899, chapter 109, entitled "An act concern-
ing compiling, indexing, publication and distribution
of the journals of the senate and house of represen-
tatives of the State of Colorado," was passed for the
purpose of making the documents, therein referred
to, record evidence of legislative proceedings, in order
that the courts, using such evidence, might be enabled
to decide cases of this character according to the
truth, instead of frittering away the safeguards with
which the people have surrounded their most sacred
rights and interests, by indulging in foolish fictions
and presumptions.

But in view of the rule which has been establish-
ed, independent of statutes, that in investigations of
this character the courts cannot go beyond the

journals of the houses, there may be some doubt as
to the propriety of considering this evidence. I deem
it advisable, therefore, to confine the investigation to
the sources of information, as to the admissibility of
which there can be no dispute, namely, the enrolled
bill as signed by the governor, and the journals of the
two houses.

Sections 88 and 88-A of the bill (L. '01, ch. 94,
p. 241) as signed by the governor, read as follows:

"Sec. 88. At the hour of 10 o'clock a. m., on the
first Tuesday in August in each year, all the county
assessors of this state shall meet at the capitol, and
the auditor of state shall provide a place for them to
meet, where they may have an opportunity to com-
pare their assessments before making affidavit there-
to, and if, upon such comparison, and from other
information obtainable, any assessor is satisfied that
his valuation of any class of property is too high or
too low, and that it does not correctly set forth the
true value thereof, it shall be his duty to correct the
same, and thereafter make affidavit thereto, as is re-
quired by section 86 of this act. If any unforeseen
or urgent reason shall intervene, making it necessary
for any assessor to be absent from any such meeting,
the auditor of state may excuse such assessor from
attendance and his assessment roll may be produced
to the auditor and sworn to before or after said
meeting, without in any wise affecting the validity of
the assessment. (*It shall be the duty of the assessors
of the state at such annual meeting to elect of their
number thirteen assessors who shall constitute a board
known as the State Board of Assessors. And for the
purposes of this act, the counties of the first class shall
elect one assessor, the counties of the second class two, the*

*counties of the third class three, the counties of the fourth class five, and the counties of the fifth class two, which shall be chosen by the vote of the assessors from their respective classes of the counties from which they are elected. Said classification shall be made under an act entitled "An act to amend sections one (1), two (2), three (3), seven (7), nine (9), ten (10), eleven (11), thirteen (13), fourteen (14) and seventeen (17) of an act entitled 'An act to provide for the payment of salaries of certain officers, to provide for the disposition of certain fees, and to repeal all acts inconsistent therewith,' approved April 6, 1891, and to repeal all other laws in conflict therewith approved April 11th, 1899. The members of the said board shall receive as compensation for their services five dollars per day and their actual traveling expenses."*

*"Sec. 88-A. It shall be the duty of the board of assessors to convene and organize the said board immediately upon their election, not later than the second Tuesday in August of each year, and)* to assess all the property of this state owned, used or controlled by railway companies, telegraph, telephone and sleeping or other palace car companies; provided, however, that real estate owned by any railway company and not used for the convenient and proper operation of its railways and improvements thereon shall not be included in said assessments, but such real estate and improvements thereon shall be assessed and taxed in the same manner as other real estate in the county where the same is situated, anything herein to the contrary notwithstanding."

The portion of the two sections enclosed in brackets and printed in italics was proposed *verbatim* by the report of the conference committee, and ap-

pears on the first of the type written pages above referred to. That part of section 88 following the bracket is introduced in the report by these words:

"Page 46, line 24, beginning with the word 'It,' strike out the sentence up to and including the word 'meeting,' and insert the following."

That part of section 88-A preceding the bracket is proposed in this form:

"Page 46, line 26, before the words 'to assess,' insert the following:

"Section 88-A. It shall be the duty of the board of assessors to convene and organize the said board immediately upon their election, not later than the second Tuesday in August of each year, and"

"The following to be section 88-B."

The senate amendment to section 88 was thus made:

"Page 46, line 24, beginning with the word 'it,' strike out the remainder of the section."

It will be observed, first, that the new section number, 88-A, was created and proposed by the report of the conference committee; second, that the senate amendment and the report both begin to strike with the word "it" in line 24 on page 46; third, that the words "to assess" stood in line 26 on page 46.

It is clear, therefore, that all of section 88-A, beginning with the words "to assess," was a part of section 88 in the bill as it passed the house, and that it stood on the second line below the point at which the senate amendment began to strike. . If, then, we eliminate from sections 88 and 88-A the portion enclosed in brackets, which was proposed by the conference committee, we have left section 88 as it stood in the bill passed by the house, with the exception of

less than two lines preceding the words "to assess," and which began with the word "it" and ended with the word "meeting."

Because of the *hiatus* thus created, it does not expressly appear who were the persons charged with the duty of assessing the property of the *quasi* public corporations enumerated in the section. But that fact is readily deduced. Section 88 provided for one meeting, and one only. That is clear, both from the text of the section and from section 89, which in the bill as passed by the house immediately followed section 88. That section begins as follows:

"Section 89. After *the* meeting of the assessors as aforesaid."

The meeting provided for was to be composed of "all the county assessors of this state." It was provided for two purposes, namely, to compare assessments with a view to making corrections, and to assess the property of *quasi* public corporations. The conclusion is necessary that what was to be done at the meeting was to be done by the officers who composed the meeting.

This conclusion is verified with absolute certainty by reference to the journals of the house. Under date of the 15th day of February appears the report of the finance committee, to which had been referred house bill No. 1. It recommended as an amendment to section 88 the insertion of the following, to stand immediately after the word "assessment," which is the last word before the brackets in the section as printed above:

"At each annual meeting of the assessors of this state as provided in this section the assessors of each judicial district in attendance at such meeting shall

elect one of their number, who shall constitute a board of assessors, the duties of which are more fully set out in section 115 of this act, and such assessors shall continue to serve as such board of assessors until their successors are elected according to the terms of this section, which list when selected shall be by them certified to by the auditor of state."

From the finance committee the bill went to the committee of the whole, and under date of the 2nd day of March we find the report of that committee, in which it is recommended that the amendment of the finance committee be stricken out, and the following inserted in lieu thereof, to stand in the same place in section 88; that is, immediately after the word "assessment," preceding the bracket:

"It shall be the duty of said State Board of Assessors to assess all the property of this state owned, used or controlled by railway companies," etc., the amendment being identical with section 88-A as printed above, beginning with the words "to assess."

The report of the committee was adopted and the amendment proposed incorporated in the bill. Thus it expressly appears that the persons, charged by the bill as it passed the house with the duty of assessing the property of *quasi* public corporations, were all the county assessors of the state.

Section 88 of the bill as transmitted to the senate, then, provided for an annual meeting on the first Tuesday in August of all the county assessors of this state for the purpose of comparing assessments with a view of making corrections, and for the purpose of assessing the property of *quasi* public corporations. The senate amended by striking out all that part of the section which related to the assessment of corpor-

ation property, and inserted a new section, which devolved that duty upon the State Board of Equalization, who were to meet on the first Monday of June in each year for that purpose. This, the senate, in its amendments, called a new section, and provided that it should be numbered 96, and that the numbers of all succeeding sections in the bill should be changed accordingly.

It was the radical difference of opinion on this important question which kept the two houses apart until the evening of the last day of the session. The last conference committee, which was appointed during that evening, finally agreed upon a compromise. It proposed that the plans of both houses be rejected and a new plan adopted, under which the duty of assessing such property should be devolved upon a board of thirteen county assessors, to be elected by all the county assessors of the state at their annual meeting, according to the classification of counties; and from whose decision an appeal might be taken to the State Board of Equalization. To accomplish this it proposed to split section 88 at the point where the senate amendment began to strike out, and insert the new matter which appears above in brackets, which had the effect of creating two sections instead of one. To provide for the right of appeal agreed upon, they inserted an entirely new section, numbered 88-B, which appears upon the last three of the type-written pages above referred to. That section in substance constitutes the State Board of Equalization a court of review, with jurisdiction to hear any appeal that may be taken by any corporation, company or individual whose property is assessed by the State Board of Assessors, or by any Board

of County Commissioners. It provides for the service of notice upon the parties affected, and clothes the board with power to issue process to compel the attendance of witnesses, and the production before it of any and all books and papers which it may deem necessary, to arrive at a proper determination of the matters concerning which the appeal is taken. It provides that the Board of Equalization shall have the power to make such changes in the assessments made by the State Board of Assessors, concerning which the appeal is taken, as shall appear just and proper, and further provides that if the decision of the State Board of Assessors shall be affirmed upon appeal, the State Board of Equalization shall have the power to assess the costs and expenses against the party or parties taking the appeal.

The matter upon which the houses differed, and which formed the subject of compromise was undoubtedly one of the most important considered by the general assembly during its session, both as concerns the people at large, and the immense interests directly affected.

The legislation proposed by the report of the conference committee was an absolute departure, both from the bill as passed by the house, and from the senate amendments. That it constituted a material and substantial amendment is entirely too clear for serious discussion. An amendment of practically the same character was passed upon by the supreme court in the case of House Bill No. 250, 26 Colo. 234, and was held to be clearly "substantial," within the meaning of the term as used in the constitution.

Two questions arise upon these amendments— first, did the constitution require them to be printed?;

second, were they in fact printed? These I will consider in inverse order.

Colo. Const., Art. 5, § 22, reads as follows: "Section 22. Every bill shall be read by title when introduced, and at length on two different days in each house; all substantial amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill, and no bill shall become a law except by a vote of a majority of all the members elected to each house, nor unless on its final passage, the vote be taken by ayes and noes, and the names of those voting be entered on the journal."

Respondents contend that, if this section applies to the amendment in question, the journals being silent, the court must presume that the constitutional requirement was complied with.

Presumptions cannot be permitted to kill the truth; they furnish the rule of evidence only when the truth cannot be shown. Hence an impossibility will never be presumed, nor can a presumption ever prevail over a self-evident truth.

The rule of presumptions, applicable to the proceedings of legislative bodies, accurately stated is— whenever a thing should have been done and could have been done, then, the journals being silent, it will be conclusively presumed that it was done.

For illustration, the journal of the house shows that the report of the conference committee was adopted upon one motion, and the bill, as thereby amended, was thereafter passed upon a second motion. If these two motions had been carried on different days, then, the journals being silent, we should presume that in the intervals the amend-

ments had been printed. But we know from the journal that the conference committee was not appointed until after 8 o'clock in the evening of the last day of the session, and that considerable business was transacted before its report was presented. Hence we cannot presume that the amendments were printed because it would have been physically impossible for it to have been done.

From the senate journal it appears that the presentation of the report was immediately followed by the motion for its adoption, and that this was the final action taken upon the measure. It is by this vote it is claimed that the final passage of the bill was effected. If this be true, then the adoption of the amendments, and the final passage of the bill occurred simultaneously, and any presumption of printing is necessarily excluded.

But respondents contend that although it may appear that the amendments were not printed after the presentation of the report of the conference committee, there is nothing to show that they had not been printed at some unlocated time prior to the presentation of that report; and, therefore, it must be presumed that they were so printed.

If presumptions of this character are to be indulged in, we may as well burn the constitution, and declare at once that the general assembly has no limitation upon its powers. If the journal of the senate should show that a senator introduced a bill, and moved that it be not printed, but be referred to the committee of the whole for consideration, that the motion carried and that thereafter the bill passed, it could as well be argued, if its validity should be assailed on the ground that it had not been

printed, that there was nothing to show that it had not been printed at some time prior to its introduction. The answer is obvious. We cannot speculate as to the origin of ideas which become embodied in legislative acts. We cannot introduce the doctrine of reincarnation into the domain of law. Every legislative proposition must have its official birth, behind which we cannot go, and which we must assume to be its origin. This official birth occurs when the proposition is regularly presented to the legislative body for its consideration. We are bound to conclude, therefore, that these amendments originated with the conference committee, and were first presented to the two houses by its report.

But if by any stretch of imagination, we may suppose that these amendments had been presented at some previous time, we cannot presume that they were printed, because it was not a thing which should have been done *at that time.*

The language of the constitution is not that all proposed amendments shall be printed, but all *amendments made* shall be printed, An amendment is not made until it is adopted. The obvious intent of the provision is that when an amendment has been adopted it must be printed, and *printed as an amendment made,* so as to supplement and make fully effective that provision of the constitution which declares that no bill shall become a law unless it be printed. If, therefore, it was necessary for these amendments to be printed, the time for printing was after their adoption, and it cannot be presumed that they were printed prior to that time.

I may go a step further—even if we may assume that they had been printed at some prior time, such

printing would not be effective as a compliance with the constitutional provision, because they could have been printed only as proposed amendments, whereas the constitution requires amendments to be printed as adopted. To hold otherwise would render the provision worse than useless, because, instead, of preventing, it would facilitate the practice of fraud, trickery and deceit. Under the constitution, the members must be advised by printed bill and printed amendments as adopted, as to what they are voting upon on final passage. It being certain that the amendments were not printed when and as the constitution requires (if it is applicable to such amendments) there is no basis for a presumption, and none can be entertained.

I am compelled to held, therefore, that it affirmatively appears, with certainty, upon the face of the journals, that these amendments were not printed.

Upon the first question, respondents contend that the phrases "final vote" and "final passage" are employed in section 22 in the sense accepted in parliamentary usage, and mean the regular vote on and passage of a bill, on third reading; that the provision as to printing amendments, therefore, applies only to such amendments as are made to a bill before it is passed on third reading, and cannot be applied to amendments subsequently proposed by a conference committee.

On the part of the relators, it is contended that the phrases "final vote" and "final passage" should be given their literal significance, and should be interpreted to mean the last, ultimate act of the legislative body on the bill as perfected, by virtue of which it is sent to the governor for approval. Each side has

cited several respectable authorities in support of its contention.

In the case of House Bill No. 250, *supra*, the supreme court had the constitutional provision in question under consideration. It was held in the most unequivocal terms that the provision is mandatory, and that it is for the courts, and not for the legislature, to determine whether or not an amendment 'is substantial, within its meaning.

As to the purpose of the provision, the court says: "The object of this requirement, that every substantial amendment to a bill shall be printed for the use of the members before final vote is taken, is to prevent as far as possible fraud and trickery and deceit and subterfuge in the enactment of bills, and to prevent hasty and ill-considered legislation. The printing of such amendments directly brings to the attention of members their character and effect. Thereby, in the judgment of the framers of such constitutional safeguard, the dangers are greatly lessened if not altogether avoided."

Colo. Const., Art. 5, § 20, reads: "No bill shall be considered or become a law unless referred to a committee, returned therefrom and printed for the use of the members."

Reading the two provisions together, in the light of the decision quoted, it is perfectly manifest that their general intent is to avoid the evils pointed out by the supreme court, by preventing any substantial provision, whether incorporated in the original bill or added thereto by way of amendment, from being enacted as law, unless it should be printed before such enactment, in order that the members of the legislature might have full opportunity to intelli-

gently consider the same.

In view of this manifest intent, it is entirely unreasonable to suppose that by the clause, "before the final vote is taken," was intended to be fixed an arbitrary point of time, before which nothing could become law without being printed, and after which anything might become law, though not printed.

Whenever the discretion is vested in a person to perform or not perform a certain act, and the law imperatively commands that he shall do a certain thing before performing that act, then the doing of that thing is a condition precedent to the performance of the discretionary act; and the command is, in effect, a prohibition against the exercise of the discretionary power until that thing be done.

For instance, the constitution provides that every civil officer shall take the oath of office before he enters upon the duties of his office. It does not command that he shall take the office; he may take it or not as he pleases. But if he decides to take it, then the oath of office is a condition precedent to his entering upon its duties, and the provision is, in effect, a prohibition against his entering upon such duties until the oath has been taken.

So under this provision, the senate or the house may or may not take a final vote on a bill, as it sees fit. But if it decides to do so, then the printing of all substantial amendments is a condition precedent, and the provision is in effect a prohibition against the taking of a final vote until all substantial amendments have been printed. Then, since the constitution requires the taking of a final vote to be postponed until all substantial amendments have been printed, the natural and reasonable conclusion is that

by the phrase "final vote," is meant the ultimate act of the legislative body, after which no amendments can be made.

The same conclusion is reached by applying the settled rules of construction. Whenever a word or a phrase is susceptible of two meanings, that meaning must be accepted which harmonizes with the context.

The constitutional mandate is plain and unambiguous. All substantial amendments made to a bill shall be printed—all, without qualification, limitation or exception. A bill remains a bill until it becomes a complete law by the governor's approval, or by passage over his veto, or by his failure to return it, as prescribed by the constitution. Hence the words, "all substantial amendments made to a bill," include within their natural and literal meaning every substantial amendment which can be made to a bill before it becomes a complete law.

Suppose that the phrase "final vote," is susceptible of two meanings, the one contended for by respondents, and the one contended for by relators. If we assume the former to be correct, namely, that it means the vote on third reading according to parliamentary usage, then the mandate does not mean what it says. It does not mean that *all* substantial amendments shall be printed; but that all substantial amendments, *with certain exceptions*, shall be printed.

On the other hand, if we assume that the contention of the relators is correct, that the phrase means the ultimate act of the legislative body on the bill as perfected, then the mandate means exactly what it says. Hence we are bound to accept the latter interpretation as the true one. It is a meaning conveyed exactly by the words, and the only

meaning which harmonizes with the context and with the general intent of all the provisions bearing upon the subject.

The cases cited involved the construction of the phrase "final passage" as used in provisions similar to the last clause of our section 22, which provides the majority necessary for the final passage of a bill, and the manner in which the vote shall be taken. The question in several of them was whether, in the absence of an express constitutional provision, the adoption by one house of amendments made by the other was a final passage of the bill, so as to require the constitutional majority, on a vote .taken in the prescribed way for the final passage of bills.

The cases cited by respondents hold that, since "final passage" means passage on third reading, voting by one house to concur in an amendment made by the other is not a final passage within the meaning of the provision, and that an amendment made by one house, no matter how substantial, can be adopted by the other house, by the bare majority of 'a° quorum, without spreading the names of those voting on the journal, and that the carrying of the motion by such vote operates as a passage of the bill as amended.

The better reasoned cases, in my judgment, hold that it being the manifest intent of such constitutional provisions that no substantial provision can be enacted as law except by the constitutional majority prescribed, on a vote taken as prescribed, the phrase "final passage" must be construed so as to give that intention full effect, and that therefore after amendment by one house of a bill passed by the other, the bill must again come up for final passage in the

house of its origin and that the adoption by one house of amendments made by the other cannot be considered a final passage of the bill, unless the amendments be adopted by the same majority and in the same manner provided for final passage of bills.

The exact question raised in these cases can never arise in this state, because of the express constitutional provision concerning the adoption by one house of amendments made by the other; but the question may arise upon the receding by one house from its own amendment, when not concurred in by the other.

For instance, suppose that a bill originates in and passes the house of representatives appropriating one hundred thousand dollars for a stated purpose; the bill is transmitted to the senate, and that body amends it by striking out the word "hundred", thus making the appropriation one thousand dollars; the bill is returned to the house and it refuses to concur in the amendment; in the senate a motion is then put and carried by a bare majority of a quorum that the senate recede from its amendment, the names of those voting not being recorded. According to authorities cited by respondents, the bill as originally passed by the house would be constitutionally enacted. Such a conclusion is, in my judgment, opposed to common sense and reason, and in direct conflict with the law as announced by the supreme court of the state.

In Robertson v. The People, *snpra*, one of the questions raised was the validity of a certain statute, which it was contended had not been passed in accordance with the constitutional requirements. It appeared that the act was introduced in the senate and

regularly passed, and while pending in the house was amended by adding a section, the amendment being regularly passed, the ayes and nays being called and entered upon the journal. Upon its return to the senate, the senate refused to concur in the house amendment, and thereupon a committee of conference was appointed by the two houses. This committee recommended that the house recede from its amendment. Upon consideration of this report by the house, the question being "Shall the house recede from the amendment and adopt the report of the committee?" the ayes and nays were had and entered upon the journal, and a constitutional majority voted in the affirmative, and the report was adopted.

In the opinion it is said: "It is insisted by counsel for plaintiff in error that although the house passed the bill as amended, by a constitutional majority, and afterwards receded from its amendment by a like vote, that by its failure thereafter to repass the bill there was a non-compliance with section 22, article 5 of the constitution, which provides, *inter alia*, that No bill shall become a law except by vote of a majority of all the members elected to each house; nor unless on its final passage the vote be taken by ayes and nays, and the names of those voting be entered on the journal.'

"The primary purpose of this provision is to secure the approval of a bill by a majority of the members elected to each house, and as a condition to its becoming a law, and when the procedure had in the respective houses has accomplished that purpose, and a bill has so received such approval, the requirements of the provision have been complied with. As shown

by its journal; the house passed the bill as it came from the senate, with a section added, in strict conformity to the constitutional requirement, by a vote thereon taken by yaes and nays, and entered on the journal, thereby approving the bill, including the amendment. Thereafter, by an aye and nay vote entered on the journal, it deliberately receded from its amendment, leaving the bill intact as it came from the senate, thereby evidencing its approval of the same without the amendment. We think by the latter vote, the house clearly manifested its intention to recede from its former vote only as to the amendment, and leave it, in so far as it was an approval of the first section of the bill, undisturbed. The legislative will, therefore, having been expressed in the manner provided by the constitution in favor of the bill as it originally passed in the senate, the first ground of objection is not well taken."

The court then cites and distinguishes the case of The People v. De Wolfe, 62 Ill. 353, and says: "The court held, that it appearing on the face of the journal that the amendment was not receded from by a constitutional majority, such vote was inoperative. In holding the act invalid the court say: 'It had passed the bill only as amended. It does not follow that the bill stripped of the amendment did receive, or would have received the assent of the constitutional majority of the senate. The question is, to what did a constitutional majority of the senate give their assent?

"It is fairly inferable, from the language of the court used, that if a constitutional majority had voted for receding from the amendment, the bill would have been constitutionally passed. That such was the effect of the decision, we refer to the language

used by Chief Justice Walker in commenting upon it in his dissenting opinion, in the case of The People v. Lowenthal. 93 Ill 191."

The court then quotes with approval from the case of the Division of Howard Co., 15 Kan. 194, in which the facts were identical with the one under consideration, with the exception that the bill originated in the house instead of the senate, as follows:

"We think that the provision of the constitution requiring that 'the yeas and nays shall be taken, and entered immediately on the journal, upon the final passage of every bill or joint resolution,' was' sufficiently complied with. It would of course have been more formal if the senate, after receding from its own amendments, had again put the bill upon its final passage, and passed the bill without the amendments, as it had done with the amendments."

From this decision it will be observed that the supreme court holds, first, that when one house amends a bill which has been passed by the other, and the house of origin refuses to concur in the amendment, then the bill must again come up in the house which makes the amendment for final passage, within the meaning of section 22; second, that in such case, if the motion to recede from the amendment be carried by a constitutional majority on a vote taken by ayes and nays, with the names of those voting entered upon the journal, this may be considered as a substantial compliance with the provisions of section 22, without the formality of repassing the bill.

This case, in my judgment, conclusively settles that the phrases "final vote" and "final passage" as used in section 22 mean the ultimate act of the legis-

lative body on the perfected bill as it is intended to go into the hands of the governor for approval. The reason given by the court for dispensing with the formality of repassing the bill after receding from the amendment is substantially that the motion having been carried by a constitutional majority in the manner prescribed for the final passage of bills, that action was *per se* a final passage, and, therefore, a substantial compliance with section 22 of the constitution. It follows from this reasoning that if the motion had been carried by a bare majority of a quorum, or if the roll had not been called, and the names of those voting been entered upon the journal, the adoption of the motion would not have operated as a final passage of the bill, and it would then have been necessary for it to be repassed in accordance with the provisions of section 22.

And this decision inexorably forces the conclusion that the vote taken by the senate upon the report of the conference committee cannot be considered as a final vote to effectuate the passage of the bill as amended by said report. Because it being settled that the phrase "final vote" means the ultimate act of the legislature on the perfected bill, it necessarily follows that the constitutional provision covers every substantial amendment that can be made to a bill before it becomes a complete law; and is, in effect, a prohibition against the taking of a *final* vote upon any bill, until every substantial provision therein contained, whether originally or by way of amendment, has been printed for the use of the members. It is true that the vote was taken by ayes and nays; that the names of those voting were entered upon the journal, and that a constitutional

majority voted in the affirmative; but since the report contained substantial amendments which had not been printed, and since the constitution prohibited a final vote being taken before those amendments were printed, it follows that the action of the senate must be regarded as the adoption only of the amendments. After this action, in order that the bill might be constitutionally passed, it was necessary that the amendments should be printed, and the bill thereafter be repassed in compliance with section 22.

In the case of House Bill No. 250, *supra*, the court says: "But the real question is not whether in fact fraud or deceit has been practiced, or hasty or ill considered legislation has been passed; but it is whether the amendment which was not printed as the constitution requires, is, in law, deemed by the court to be substantial. *If so, a bill that goes through the general assembly, carrying such an amendment is not constitutionally passed, and the mandate of the constitution makes it nugatory* even though, in a particular case, the court might see that the evil consequences sought to be prevented had not ensued."

This language, it appears to me, clearly supports the reasoning pursued. It will be observed that the court does not say—"If the bill passes third reading carrying such amendments," but *"If a bill goes through the general assembly."* That is to say, if in the bill as enrolled and authenticated by the presiding officers and signed by the governor, there can be found any substantial provision which was not printed before the final vote was taken on such provision, then the bill has not been passed in compliance with the constitution.

But it is contended by respondents that what-

ever may be the meaning of the phrases "final vote" and "final passage" in section 22, the provision as to the printing of amendments can have no application to the amendments in question, because they were contained in the report of the conference committee, for action upon which special provision is made in section 23.

That section reads as follows: "Sec. 23. No amendment to any bill by one house shall be concurred in by the other, nor shall the report of any committee of conference be adopted in either house except by a vote of a majority of the members elected thereto, taken by ayes and noes, and the names of those voting recorded upon the journal thereof."

It is argued that since this section requires the concurrence in an amendment or the adoption of the report of a conference committee to be by the same majority, upon a vote taken in the same manner, as required for final passage of a bill, it was intended that such action should have the force and effect of a final passage; and that, since the adoption of such a report finally enacts all that is contained therein, the printing provision cannot apply, because the printing required by section 22 must be done before final enactment.

I think it is true that it was contemplated by section 23 that the adoption of the report of a conference committee might operate as a final passage of the bill reported upon; but it by no means follows that it was intended that it should so operate in all instances.

The various provisions of the constitution in relation to this subject are not disjointed fragments,

each performing a separate office, independent of the others. They are parts of one harmonious system, and must be read and construed together. If the contention of respondents is sound, then a conflict arises between sections 23 and 22, to harmonize which makes it necessary to read an exception into the former section. Instead of "All substantial amendments made shall be printed," we must read "All substantial amendments, except such as may be proposed by conference committees, shall be printed." There is no conflict between the language of the two sections, for each can be literally gratified. The conflict is between the inference which is sought to be drawn from section 23, and the express language of section 22. There is no rule of construction which will permit an inference to place a limitation upon, or carve an exception out of an express provision, when the latter is stated in clear and unequivocal terms. On the contrary, the inference must be restrained so as to gratify the express provision. The proper inference, therefore, to be drawn from section 23 is that it was intended that the adoption of the report of a conference committee should be effectual as a final passage of the bill reported upon, provided such action would not be in conflict with other provisions of the constitution upon the subject matter.

The purpose of a conference committee is that an exchange of views and reasons may be had between the two houses in order that one or the other may be induced to recede from its position. The bill and amendments which are referred to the committee have already been constitutionally considered and passed, and it is its duty, if possible, out of the

material placed in its hands, to create harmony. Its report proper, therefore, can go no further than to recommend that one or both of the houses accede or recede, and it is such a report, in my judgment, that is contemplated by section 23.

It is true that if an agreement cannot be reached by acceding or receding, a conference committee might properly suggest some new matter by way of compromise; but such suggestion could have no greater force and effect than if made by any other committee, or by any individual member, who might have ascertained what new proposition would be satisfactory to both houses.

Suppose that on the night of April first, before the last conference committee on this bill was appointed, the senate had been advised that the changes made by their report finally presented would be acceptable to the house; and ·of its own motion had sent for the bill; had prepared amendments identical with those proposed by the committee; had passed them; had passed the bill as thus amended, and transmitted the bill as thus amended to the house, and and that the house had concurred in the senate amendments. There cannot be a shadow of a doubt that the bill thus passed would be void, since it carried substantial amendments which had never been printed. And can it be supposed that it was intended that that which the house could not do directly, they could accomplish indirectly through the medium of a conference committee? I cannot bring myself to believe that the framers of the constitution, when they so carefully prepared the safeguards against improper or careless legislative action, were building a house of cards,

which they immediately knocked over by creating a conference committee, through the medium of which the general assembly might enact laws without any regard whatever to constitutional limitations.

If a conference committee can propose a substantial amendment, and the adoption of their report can enact such an amendment into a law, there is no limit to the power of the legislature in this direction. If one amendment can be thus passed, any number may be passed; indeed, it would be competent thus to enact an entirely new bill. Counsel for respondents are driven by the logic of their position to admit that this is true, and in argument contended that a new bill so enacted would be a valid law. But counsel objects to the use of the argument because it is not to be presumed that the legislature would go so far in violation of the confidence reposed in its discretion.

In discussing rules of conduct we may speculate upon what is likely to be done; but in discussing questions of *power*, we must investigate what can be done. Constitutional provisions are not rules of conduct for the guidance of the legislature, but are limitations upon it powers. The theory of all state constitutions is that the legislature is vested with absolute power within the constitutional limitations. In investigations of this character, we are never troubled about finding the existence of the power. Our chief concern is to find the limitation, and we cannot find the limitation until we go to the very limit of the power—to the boundary line, where the constitution has posted its warning to the general assembly—'Thus far shalt thou go, and no farther.'' The argument, therefore, is not only proper, but a necessary

one. I repeat, therefore, that if these amendments were constitutionally adopted, and this bill constitutionally enacted, then, if on the night of April first, the conference committee had reported an absolutely new revenue bill, and if the same action had been taken upon such report as was in fact taken upon the report presented, then the law so enacted would be valid. The result would be that we should have upon the statute books, as a valid law, an act which had never been referred to a committee, which had never been printed for the use of the members, and which had not been read at length on two different days in each house, in the face of the plain, unambiguous declarations of the constitution that no bill shall ever become a law unless these things are done. The utterly preposterous character of the result demonstrates the unsoundness of the construction from which it flows.

Colo. Const., Art. 5, § 1. "The legislative power shall be vested in the general assembly, which shall consist of a senate and house of representatives."

Under this section each and every legislative function must be exercised by the houses, and under it every bill and every amendment to a bill must originate in one or the other of them, because this is of the very essence of the power delegated. A conference committee is not the senate nor the house, nor is it contemplated in those terms. The senate and the house cannot delegate to it any of their legislative functions, so that it can originate neither a bill nor an amendment to a bill. It may suggest to the house that a bill or an amendment to a bill be originated; and, if its suggestion be followed, such bill or amendment must originate in the houses and go

through the regular constitutional procedure for the enactment of laws.

That which is necessarily implied from section 1 of article 5 expressly appears in a provision relating to bills of the character of the one now under consideration.

Section 31 of article 5 reads: "All bills for raising revenue shall originate in the house of representatives, but the senate may propose amendments, as in case of other bills."

The object of this provision is to secure to the popular branch of the general assembly the power of the purse. In order to effect this, it provides, not that such bills shall be first considered, or be first passed in the house of representatives, but that they shall *originate* in that house. The constitution thus expressly recognizes that the origination of a bill is a legislative function of the most important character. And if this be true of a bill, it is equally true of an amendment to a bill. This also is expressly recognized by the section quoted, because it provides that amendments may be proposed by the senate, which language excludes the idea of amendments being proposed by others than the senate.

The infraction of the constitution in this case cannot be more clearly stated than by saying that we have here a revenue bill, material portions of which did not originate in the house of representatives, and were not proposed as amendments by the senate.

The action of the house of representatives clearly sustains the position of this court that the inference sought to be drawn from section 23, as to the adoption of the reports of conference committees, is not a necessary one, but purely argumentative; for

that body, after adopting the report of the conference committee, deemed it necessary to re-pass the bill as amended. That it regarded—and rightly regarded—its final action on the bill as a "final passage" within the meaning of section 22, there can be no doubt. And there can be no doubt that when it placed the bill upon final passage, it carried substantial amendments which had not been printed.

The cases which have been cited from other states are of little or no value in the consideration of the questions involved, for it does not appear that they were decided on a like state of facts, under similar constitutional provisions. Of course no case would be of any material value unless it were decided under a constitution which requires all substantial amendments to be printed.

The case nearest in principle is that of Nelson v. Haywood Co., 20 S. W., 1. In that case after a disagreement between the two houses a conference committee was appointed, which made the following report: "Your committee of conference, to whom was referred Senate Bill No. 10, with house amendments, beg leave to report the accompanying bill in lieu of said bill and amendment, in which is embraced substantially all the provisions of both houses. Your committee deem it prudent to propose a bill in lieu as the original has been much disfigured by amendments, interlineations and erasures." This report was regularly adopted by both houses. A majority of the court held that the bill had been constitutionally passed. Two of the justices dissented. It is clear from the opinions that there was no division upon the proposition that, if the bill reported by the conference committee was

a new bill, it would be necessary for it to pass three readings in each house. The majority sustained the act because, in their opinion, it was substantially the the same bill, together with the amendments, which had been referred to the committee. The minority were of the opinion that it was not the same bill. And so in the case at bar, if the conference committee had reported an entirely new bill, there can be no doubt that it would have been necessary for it to be referred printed, and read at length on two different days in each house. And by the same reasoning, there is no doubt in my mind that the new amendments which were proposed, should have been adopted and printed, before a final vote could be taken on the bill.

Bearing in mind that the purpose of the printing provision is as stated by our supreme court, to prevent hasty and ill-considered legislation, I think it is proper in order to accentuate the soundness of the conclusion, to advert to the circumstances under which it was attempted to enact this measure.

On the night of the last day of the session a bill was referred to a conference committee upon a question of the first magnitude, on which the houses had stubbornly differed. Within a short time prior to final adjournment that committee presented a long, complicated report proposing legislation radically different from anything which had been considered by either of the houses, and on motion its report was adopted. That the members could have had any accurate conception of the exact effect of the amendments proposed it is impossible to believe. They may have had, and probably did have a conception of their general purpose and effect. If they did, they

must have derived it from verbal explanations of those who planned the compromise. Upon such information and consideration, law is attempted to be made. This is clearly not in accordance with the spirit of the constitution. The fundamental idea of the provisions relating to the enactment of laws is that of individual responsibility. It was not intended that the legislator in performing his duties should rely upon the explanation or information conveyed by others, or that he should be controlled or influenced by party caucus, or by party leaders. It was intended that each and every substantial provision proposed to be enacted as a law should be printed in cold black and white, in order that he might consider it, alone with his own conscience, so that when the final responsibility should come up to him, he could not evade it by pleading misinformation or misunderstanding.

The case clearly presents a flagrant instance of the evil to which the supreme court referred ; and if the procedure of the houses in the premises can be sustained, then the framers of the constitution were entirely mistaken in supposing that they had constructed provisions which would avoid the danger of hasty and ill considered legislation.

I conclude, therefore:

First: That the action of the house of representatives in placing this bill upon final passage was in violation of section 22 of Article V of the constitution, because said bill carried with it substantial amendments which had not been printed.

Second: That the action of the senate in adopting the report of the conference committee was, constitutionally, an adoption only of the amendments

contained therein, and was not a final passage of the bill.

Third; That the bill being rendered nugatory by constitutional mandate, the relators are entitled to the relief prayed for.

Entertaining no doubt whatever as to the correctness of these conclusions, I deem it unnecessary to express any opinion on the first objection urged against the validity of the statute.

However much this result is to be deplored, it cannot be avoided. No passing necessity, however urgent, can ever justify a clear infraction of the fundamental law. In such a case, to all arguments based upon public convenience or public policy, the courts can make but one answer—"what is written, is written."

The distinguishing feature of our American system of government is the liberty of the individual, and it is just as essential to protect the individual, from the oppression of the many as it is from the tyranny of the despot.

To this end constitutional government is ordained, and under the broad shield of the constitution, if justice reigns in the land, the humblest citizen may take refuge and say—"though I be alone, yet will I not be afraid."

It is well for us to remember that the views and policies upon which we are now divided are ephemeral, but that the constitution is permanent.

It is well to remember that the majority of today may be the minority of tomorrow; that the statutes of one session may be swept from the books at the next; and that those who now think they are justified in construing away the constitution, may shortly be

imploring its protection.

Our interests as adherents of this policy or that policy, may pass away in the night while we sleep. The only interests that abide with life are our interests as individual citizens of the commonwealth, which are secured and guaranteed by the constitution. It behooves us, therefore, to look upon that instrument, not as a dead parchment, to be hidden from view or brought to light, as the emergencies which we ourselves create may demand; but as the ever-living, ever-present, supreme law, the rigid enforcement of which, at all times and under all circumstances, is essential to the perpetuation of free government, and the preservation of our liberties as individuals.

The writ is granted.